THE WESTON FIRM
GREGORY S. WESTON (239944)
greg@thewestonfirm.com
MELANIE A. PORTER (253500)
melanie@thewestonfirm.com
5127 Lotus Street
San Diego, CA  92107
Telephone:   619 255 7098
Fax:              480 247 4553

Counsel for Plaintiffs

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| STEVE ADACHI, SHARLYNE BRAUDE, JEREMY CARSON, ERICKA GARDEA, MICHAEL GARDEA, PARAG GUPTA, SUGANDHA GUPTA, GLENN HENDERSON, MARY HENDERSON, STEVE HENDERSON, VICTOIRE HOVLAND, DOUGLAS KIM, YOGENDRA KUMAR, IMAAN MOHAMMADPOUR, RIYE PARK, GREG PERRAULT, EILEEN PEVIANI, TED SUMIDA, and JESSICA VANDERLAN, on behalf of themselves and all others similarly situated, | Case No: 2:09-cv-00793 MMM AJW |
| | **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO COMPEL BINDING DISPUTE RESOLUTION PROCEDURES AND MOTION FOR DISMISSAL AND/OR STAY OF ACTION** |
| Plaintiffs, | Date: April 13, 2009 |
| v. | Time: 10:00 a.m. |
| CARLYLE/GALAXY SAN PEDRO, L.P., CARLYLE SAN PEDRO GP, L.L.C, GALAXY SAN PEDRO, L.L.C., CARLYLE SAN PEDRO, L.L.C., CARLYLE REALTY PARTNERS IV, L.P.,  GALAXY COMMERICAL HOLDING, L.L.C., RAFFI COHEN, and MARA ESCROW COMPANY, | Location: Courtroom 780 |
| | Judge: The Hon. Margaret M. Morrow |
| | Pleading Type: Class Action |
| Defendants. | |

# TABLE OF CONTENTS

I.      Introduction……………………………………………………………1

II.     Defendants have waived their equitable right to compel specific performance of ¶12…………………………………………………………………...1

III.    No agreement to submit to judicial reference or arbitration has ever existed because the contract is illusory and void ab initio…………………………...4

IV.     ¶12 is illusory because it allows Defendants to unilaterally change its terms without paying any damages to Plaintiffs…………………………………...6

V.      The arbitration provision in ¶12(b) violates the express terms of CCP 1298.7

VI.     ¶12 is substantively unconscionable…………………………………………...8

VII.    ¶12 is procedurally unconscionable……………………………………………..16

VIII.   The contract is revocable and Plaintiffs seek to revoke it………………….22

IX.     Conclusion…………………………………………………………………24

# TABLE OF AUTHORITIES

**CASES**

*Abramson v. Juniper Networks, Inc.*, 115 Cal. App. 4th 638; 9 CR 3d 422 (2004) ...................................................................................................16

*Armendariz v. Foundation Health Psychcare Services, Inc.*, 24 Cal. 4th 83 (2000) .................................................................................................16

*Brown-McKee, Inc. v. Fiatallis Constr. Machinery, Inc.*, 587 F. Supp. 38 (N.D. Tex. 1984).............................................................................. 3

*Cornell & Co. v. Barber & Ross Co.*, F.2d 512 (D.C. Cir. 1966) ...................1, 2, 3

*Culverhouse Inc. v. Saturn Transp. Sys.*, 2004 Bankr. LEXIS 2225 (Bankr. M.D. Ala. Sept. 23, 2004) ..............................................................10

*Dumais v. Am. Golf Corp.*, 299 F.3d 1216 (10th Cir. 2002) ................................. 7

*FTC v. Security Rare Coin & Bullion Corp.*, 931 F.2d 1312 (8th Cir. 1991) ...................................................................................................13

*FTC v. Solomon Trading Co.*, 1994 U.S. Dist. LEXIS 19696 (D. Ariz. June 27, 1994)..................................................................................12, 13

*Harper v. Ultimo*, 113 Cal. App. 4th 1402; 7 CR 3d 418 (2003) ......................9, 18

*Ingle v. Circuit City Stores, Inc.*, 328 F.3d 1165 (9th Cir. 2003) ........................... 7

*Kinkel v. Cingular Wireless, LLC*, 223 Ill. 2d 1 (Ill. 2006)...................................20

*Magna Development Co. v. Reed*, 228 Cal. App. 2d 230; 39 CR 284 (1964) ..................................................................................................... 6

*Mattei v. Hopper*, 51 Cal. 2d 119 (1958)............................................................. 5

*McAvoy v. Hilbert*, 2009 Cal. App. LEXIS 419 (Cal. App. 4th Dist. Mar. 24, 2009)................................................................................................. 9

*Miller Brewing Co. v. Fort Worth Distributing Co.*, 781 F.2d 494 (5th Cir. 1986)............................................................................................. 4

*Pardee Construction Co. v. Superior Court*, 100 Cal. App. 4th 1081; 123 CR 2d 288 (2002) ......................................................................................17

*Pokorny v. Quixtar, Inc.*, 2008 U.S. Dist. LEXIS 28439 (N.D. Cal. Mar. 31, 2008)...............................................................................14, 15

*RFR Indus. v. Rex-Hide Indus.*, 2005 U.S. Dist. LEXIS 44812 (N.D. Tex. Aug. 9, 2005) ..................................................................................... 9

*Roskamp Manley Assocs. v. Davin Dev. & Inv. Corp.*, 184 Cal. App. 3d 513; 229 CR 186 (1986).............................................................. 6

*Stone v. E.F. Hutton & Co.*, 898 F.2d 1542 (11th Cir. Fla. 1990)........................... 4

*Sun Kyung Ahn v. Merrifield Town Ctr. Ltd.*, 2008 U.S. Dist. LEXIS 93242 (E.D. Va. Oct. 27, 2008)....................................................24

*Thomassen & Drijver-Verblifa, N.V. v. Sardee Industries, Inc.*, 1988 U.S. Dist. LEXIS 11982 (N.D. Ill. Oct. 21, 1988)................................................. 3

*Tucker v. Apple Computer, Inc.*, 493 F. Supp. 2d 1090 (N.D. Cal. 2006).............. 9

*United States v. Wiseman*, 1993 U.S. App. LEXIS 8787 (9th Cir. Apr. 15, 1993) .........................................................................................12, 13

*Veliz v. Cintas Corp.*, No. 03-1180, 2004 WL 2452851 (N.D. Cal. April 5, 2004)...........................................................................................15

*Wilson v. Norbreck LLC*, 2007 U.S. Dist. LEXIS 26144 (E.D. Cal. Apr. 9, 2007)...........................................................................................16

**STATUTES**

15 USCS § 1703(c) ...........................................................................................22

Cal. Civ. Code § 1754...........................................................................................12

Cal. Civ. Code § 1761...........................................................................................11, 12

Cal. Code Civ. Proc. § 1281.2(b) ...................................................................22

Cal. Code Civ. Proc. § 1284.3...............................................................10, 11, 12, 13

.

1

## I.    Introduction

2    Defendants move for an order ("Motion") compelling Plaintiffs to arbitrate their

3 claims, or in the alternative to arbitrate some claims and refile the rest in state court

4 so that a judge of the California Superior Court may oversee general judicial

5 reference of their remaining claims as provided by the contract and the California

6 Code of Civil Procedure ("CCP").[1] The Court should decline to issue such an order

7 because (1) Defendants have waived their equitable right to compel specific

8 performance of ¶12 of the purchase contract by availing themselves of the forums

9 of the United States District Court system and arbitration before JAMS, Inc.

10 ("JAMS") as provided by ¶¶10 and 11 rather than before the American Arbitration

11 Association ("AAA") as provided by ¶12; (2) no agreement to submit to judicial

12 reference or arbitration has ever existed because the contract is illusory and void *ab*

13 *initio*; (3) no agreement to submit to judicial reference or arbitration has ever

14 existed because ¶12 is illusory and void *ab initio*; (4) the arbitration provision in

15 ¶12(b) violates CCP 1298; (5) the arbitration and judicial reference provisions are

16 both procedurally and substantively unconscionable; (6) the contract is revocable

17 under federal law and Plaintiffs seek to revoke it.

18
19
## II.    Defendants have waived their equitable right to compel specific performance of ¶12.

20    In *Cornell & Co. v. Barber & Ross Co.*, a panel that included future Chief

21 Justice Berger affirmed a denial of a corporation's motion to compel arbitration,

22 noting that the moving party "waives his right to arbitrate when he actively

23 participates in a lawsuit or takes other action inconsistent with that right." 360 F.2d

24 512, 513 (D.C. Cir. 1966). In *Cornell & Co.*, those actions were (1) moving for

25 transfer of venue; (2) filing counterclaims; and (3) seeking discovery. *Id.* That

26

27 ───────────────
[1] That Defendants appear unable to figure out what the terms of their own contract require speaks loudly of its substantive unconscionability.

28

1

1    motion to compel arbitration was not filed until "some four months after the

2    complaint was filed." *Id.*

3        Here, the facts are strikingly similar to *Cornell & Co.* Defendants' Motion was

4    filed 4.5 months after the complaint, also after Defendants filed a motion for

5    transfer of venue, and also after Defendants sought discovery.[2] Additionally, while

6    Defendants seek an order compelling arbitration ***before AAA*** under ¶12, they have

7    initiated twelve separate arbitration actions ***before JAMS*** under ¶¶11-12 against

8    the individual *Adachi* plaintiffs.[3] Carlyle's arbitration demands, in particular its

9    demand for an award of specific performance of the purchase contract and attorney

10   fees, are essentially counterclaims,[4] completing the remarkable likeness between

11

12

13   _____

14   [2] On December 23, 2008, Defendants served Plaintiffs with ten deposition notices
     and fifteen requests for production. After conferring with Defendants, Plaintiffs
15   produced approximately 250 pages of documents and agreed to produce both of the
     proposed class representatives for deposition.
16

17   [3] Defendants seek in arbitration before JAMS, *inter alia*, "an award…Declaring
     that the Purchase Agreement is…not unconscionable," "that no grounds for
18   rescission exist," "ordering specific performance" "that [Carlyle] has not violated
     the Interstate Land Sales Full Disclosure Act" and "attorneys' fees and
19   costs…including fees paid to JAMS and/or the arbitrator in connection with the
     arbitration." In doing so, they also clearly availed themselves of this forum despite
20   Plaintiffs' repeated pleas to wait until the Court resolved their arbitration motion.
21
22   [4] See *Culverhouse Inc. v. Saturn Transp. Sys.,* 2004 Bankr. LEXIS 2225 at *12
     (Bankr. M.D. Ala. Sept. 23, 2004). Here one party made a claim in bankruptcy
23   court and the other party made a claim against the first in arbitration. The court
     concluded that the claim in arbitration was effectively a counterclaim because "to
24   hold that the claim of Culverhouse is not a counterclaim would be to exalt form
     over substance. … It is clear that the [two claims] arise from the same occurrence,
25   *i.e.* the termination of the two contracts in issue. Conflicting claims arising out of
     the same occurrence are counterclaims[.]" See also Black's Law Dictionary
26   (defining a "counterclaim" as "a claim for relief asserted against an opposing party
27   after an original claim has been made").
28

the acts deemed a waiver of the right to enforce an arbitration provision in *Cornell & Co.* and Carlyle's actions in the present case.[5]

A party "waive[s] its right to arbitration by acting inconsistently with this right and by causing prejudice" to the opposing party. *Thomassen & Drijver-Verblifa, N.V. v. Sardee Industries, Inc.*, 1988 U.S. Dist. LEXIS 11982 at *2 (N.D. Ill. Oct. 21, 1988) (denying motion to compel arbitration). In *Thomassen*, the court concluded that parties are prejudiced by expending lawyer hours and incurring legal fees on matters that are inconsistent with the right to compel arbitration. Indeed, causing a counterparty to spend just 100 hours of work and $1,400 in attorney fees can be considered a waiver, "even though some of the data could be used before an arbitration board or in defense of any subsequent suit." *Brown-McKee, Inc. v. Fiatallis Constr. Machinery, Inc.*, 587 F. Supp. 38, 39-40 (N.D. Tex. 1984) (same).

Defendants' past conduct of aggressively pursuing arbitration of Plaintiffs' claims ***before JAMS*** is wholly inconsistent with Defendants' present demand for arbitration of Plaintiffs' claims ***before AAA***. As a direct result of Defendants' availment of JAMS's forum, twelve of the individual *Adachi* Plaintiffs have received bills for $2,500, for a combined outstanding total of ***$30,000***. Both Defendants and JAMS have insisted that Plaintiffs are liable for paying these bills. ***Defendants need never have initiated twelve duplicative arbitration actions.*** Plaintiffs repeatedly requested both to counsel and to JAMS that these actions be stayed until an order on the pending motion to compel arbitration was issued, and when neither Defendants nor JAMS would agree to desist, Plaintiffs moved for a

---

[5] The defendant in *Cornell & Co.* sought to excuse its actions by arguing that it was unaware of the arbitration clause until a document production, and likewise Defendants blame Plaintiffs for not raising the issue of the judicial reference provision until the second round of arbitration briefing. In *Cornell & Co.* the court rejected such excuse, noting "[a]bsent fraud or concealment … appellant must be charged with knowledge of the terms of its own agreement." *Id.* at 513-14.

protective order.[6] Plaintiffs' counsel also had to reassure panicked Plaintiffs who received multiple bills and legal documents relating to the arbitration via Fed-Ex and in at least one instance by a process server—and will continue accruing costs as the issue of who is responsible for JAMS's $30,000 bills is resolved.

Further, "a party may be deemed to have waived its right to arbitrate a dispute 'when a party seeking arbitration substantially invokes the judicial process to the detriment or prejudice of the other party.'" *Stone v. E.F. Hutton & Co.*, 898 F.2d 1542, 1543 (11th Cir. Fla. 1990), citing *Miller Brewing Co. v. Fort Worth Distributing Co.*, 781 F.2d 494, 497 (5th Cir. 1986) (both denying motions to compel arbitration). "The use of pre-trial discovery procedures by a party seeking arbitration may sufficiently prejudice the legal position of an opposing party so as to constitute a waiver of the party's right to arbitration." *Stone*, 898 F.2d at 1543. In *Stone*, the court concluded that the defendant corporation waived its right to compel the plaintiff individual to arbitrate his securities claims by engaging in discovery, including deposing the plaintiff. Here, Defendants propounded fifteen requests for production and noticed ten depositions, two of which will have occurred by the time the Court hears this Motion.

## III.    No agreement to submit to judicial reference or arbitration has ever existed because the contract is illusory and void *ab initio*.

### A.    The contract is illusory because it permits no remedy to Plaintiffs if Defendants fail to perform.

The purchase contract provides that:

Should Seller fail to complete the Property within thirty-six (36) months from the date of this Agreement, Buyer's remedies will be limited to

---

[6] Plaintiffs' proposed order read in relevant part: "Defendant Carlyle/Galaxy San Pedro, L.P. is ordered to cease its pursuit of arbitration seeking 'declaratory relief' before [JAMS] unless and until this Court orders plaintiffs into arbitration pursuant to defendants' pending motion to compel arbitration."

termination of this Agreement and Escrow and refund of all amounts deposited into Escrow by Buyer.

Purchase Contract at ¶6. Thus, the buyers are allowed no damages for the seller's non-performance. Indeed, because the contract, deviating from the industry standard, does not provide Plaintiffs with the interest that accrues on the deposit, the buyers are not even refunded the inflation-adjusted value of their deposits. By contrast, Carlyle grants itself generous liquidated damages for breach by buyers.

By permitting Carlyle to fail to perform under the purchase contract without paying damages, the contract leaves the construction of the condominium to the discretion of the developers. An agreement that "leaves a party free to perform or to withdraw from the agreement at his own unrestricted pleasure…is deemed illusory." *Mattei v. Hopper*, 51 Cal. 2d 119, 122 (1958). "As a general rule, an agreement that provides that the price to be paid, or other performance to be rendered, shall be left to the will and discretion of one of the parties is not enforceable." *Badie v. Bank of Am.*, 67 Cal. App. 4th 779, 797; 79 CR 2d 273, 283 (1998) (denying enforcement of arbitration agreement).

To avoid the invalidation of agreements as illusory, courts sometimes conclude that contracts remain enforceable "if the exercise of [discretionary] power is subject to prescribed or implied limitations." *Badie*, 67 Cal. App. 4th 779 at 797 (initially determining that a court could save an illusory contract by applying an implied covenant, such as the implied covenant of good faith and fair dealing, but ultimately declining to enforce the agreement to arbitrate). Here, however, ¶20 of the purchase contract disclaims all implied covenants and warranties.[7]

**B. The contract is illusory because it fails to express the material terms in a reasonably definite manner.**

---

[7] "The only representations, agreements and warranties made by Seller are those set forth in writing in this Agreement and in the Final Subdivision Public Report."

¶6 of the contract provides:

Buyer acknowledges that, prior to the close of escrow, Seller may make certain changes in the legal documents described below in Paragraph 13 and changes in plans for development of the Project, or change the manner or content of the offering of units in the Project. If prior to the close of escrow any of the described changes occur, Seller will provide Buyer with written notice of same, and Buyer agrees that his sole remedy at that time will be to terminate this Agreement, request cancellation of escrow and receive a full refund of all amounts deposited hereunder.

¶13 does not describe any documents, so the clause appears to refer to ¶14, which incorporates a list of documents that include "This Agreement." Thus, under the plain language of ¶¶6 and 14, Carlyle can unilaterally change the material terms of the purchase contract without paying any damages to Plaintiffs.

In *Roskamp Manley Assocs. v. Davin Dev. & Inv. Corp.,* the court affirmed a real estate contract was illusory and unenforceable, as the clause left key terms to discretion of the developer. 84 Cal. App. 3d 513, 520; 229 CR 186, 190 (1986). Although the developer argued the court could establish the material terms by reference to "custom and usage," the court found that while "evidence of custom and usage may be introduced to interpret a contract, it may not be used to create one." *Id.*

Similarly, another court affirmed a summary judgment that invalidated a real estate purchase contract which failed to specify the terms and conditions of the sale, even though the parties purported to "waive" this uncertainty in the contract, as "[a] party to a contract cannot erase uncertainty therefrom by waiving such uncertainty and thereby restore its contractual validity." *Magna Development Co. v. Reed*, 228 Cal. App. 2d 230, 243; 39 CR 284, 291 (1964).

**IV.    ¶12 is illusory because it allows Defendants to unilaterally change its terms without paying any damages to Plaintiffs.**

Because Carlyle can unilaterally change any part of the agreement, it may also modify the terms of ¶12. ***"[A]n arbitration agreement allowing one party the unfettered right to alter the arbitration agreement's existence or its scope is illusory."*** *Dumais v. Am. Golf Corp.*, 299 F.3d 1216, 1219 (10th Cir. 2002) (denying enforcement of arbitration agreement).

California courts have roundly rejected the enforceability of arbitration agreements that can be unilaterally modified by a sophisticated corporate signatory, but cannot be modified by its counterpart. In *Ingle v. Circuit City Stores, Inc.*, the court categorized "Circuit City's unilateral power to modify or terminate the arbitration agreement" as "substantively unconscionable" for being entirely "one-sided" and "grossly favor[ing] Circuit City." 328 F.3d 1165, 1173 (9th Cir. 2003) (denying arbitration).[8]

## V.    The arbitration provision in ¶12(b) violates the express terms of CCP 1298.

Defendants argue "the arbitration provision at issue complies fully with all of the special procedural requirements set forth in CCP Section 1298 for arbitration under real estate contracts." Motion at 12. This is false. CCP 1298 requires that arbitration provisions in real estate purchase contracts "be set out in at least 8-point bold type or in contrasting red." While the arbitration provisions in ¶¶10 and 11, which Defendants relied upon in their first motion, were in bold, the arbitration provision in ¶12(b), upon which Defendants now move, is not.

Failure to comply with CCP 1298 renders Defendants' arbitration clause unenforceable. In *McAvoy v. Hilbert*, a California court declined to compel

---

[8] See also *Floss v. Ryan's Family Steak Houses, Inc.*, 211 F.3d 306, 315-316 (6th Cir. 2000) (arbitration provision is "fatally indefinite" when one party "reserved the right to alter the applicable rules and procedures"); *Hooters of Am., Inc. v. Phillips,* 173 F.3d 933, 939 (4th Cir. 1999) (same); *Gibson v. Neighborhood Health Clinics* 121 F.3d 1126, 1133 (7th Cir. 1997) ("whatever 'promise' [to arbitrate] is contained in the Associate Policy Manual is illusory because it is subject to the sweeping disclaimer language … [granting defendant] the right to change or revoke any term contained in the Manual at any time[.]"

arbitration under a real estate listing agreement whose "arbitration provision does not comply with [section 1298] because it [was not]…set out in at least 10 point bold type." 2009 Cal. App. LEXIS 419 at *6-7 (Cal. App. 4th Dist. Mar. 24, 2009).[9]

## VI.    ¶12 is substantively unconscionable.

### A.    ¶12 is substantively unconscionable for forcing Plaintiffs to bifurcate claims against the same parties, concerning the same contract, and seeking the same relief.

The plain terms of ¶12 require Plaintiffs to submit their state law claims to binding general judicial reference in state court according to the "procedures adopted by JAMS for judicial reference,"[10] and to submit their federal law claims to arbitration "as administered by AAA."[11] That the contract requires Plaintiffs to split their claims into separate actions in separate forums even though their claims *involve the same parties, concern the same contract, and seek the same relief* is manifestly inefficient, duplicative, and needlessly increases costs to the point of substantive unconscionably. For example, Plaintiffs would have to file separate class certification motions in each forum, and Plaintiffs' counsel would have to deal with calls from class members confused by two sets of class notice. Many

---

[9] Defendants' apparent argument for compliance with CCP 1298 is that ¶12(b) is somehow not "a provision for binding arbitration," despite that ¶12(b) is entitled "BINDING ARBITRATION" and that Defendants repeatedly refer to ¶12(b) as an "arbitration provision" in their Motion. See, e.g., page 12 at line 3; page 14 at line 4; page 14 at line 10. To make the point all the more clear, a purchase contract for another Los Angeles development, prepared two years later by the same law firm and containing virtually the same convoluted ADR provisions, corrects this lack of compliance with CCP 1298 by changing the second provision to bold type. See Purchase Agreement for the Roosevelt Building, attached in relevant part as Ex. 2 to Weston Decl.

[10] These rules appear to be non-existent. JAMS's website contains no rules that mention judicial reference. See www.jamsadr.com.

[11] It is unclear which of AAA's materially different arbitration rules is applicable to Plaintiffs' claims. See Section VIII.

issues would have to be litigated twice with possibly inconsistent results. For example, a violation of the Sherman Act is also a violation of the Unfair Competition Law ("UCL") and the Cartwright Act. *Tucker v. Apple Computer, Inc.,* 493 F. Supp. 2d 1090, 1102 (N.D. Cal. 2006). Similarly, a violation of ILSFDA is also a violation of the UCL. However, under the bifurcated procedures of ¶12, the AAA arbitrator could determine that Carlyle violated the Sherman Act or ILSFDA, while the JAMS referee could conclude there was no violation of the UCL or Cartwright Act.

Courts are rarely willing to enforce such case-splitting binding ADR clauses. In *Harper v. Ultimo*, the defendant contractor sought an order forcing the plaintiff homeowners to litigate some claims in arbitration, and the rest in court. 113 Cal. App. 4th 1402, 1411-1412; 7 CR 3d 418, 426 (2003). The court rejected arbitration, reasoning that:

> [T]he idea that the trial court could peel off the Harpers' nonarbitral claims and allow those to be tried in superior court while the remainder were arbitrated makes no sense at all. The Harpers' misrepresentation, property damage, and contract claims are all bound up with each other. The arbitrator will be unable to avoid dealing with those issues. … Under such a scenario there is a risk of inconsistent adjudications. … In short, it would be a mess.

*Id.* Here, as in *Harper*, Plaintiffs' state and federal claims "are all bound up with each other." Thus, the arbitrator "will be unable to avoid dealing" with the issues before the referee (and vice versa). Rather than enforcing an arbitration provision that creates such a "mess," the Court should follow *Ultimo* and deny the motion.

Arbitration was denied on similar grounds in *McAvoy v. Hilbert*, 2009 Cal. App. LEXIS 419 at *7 (Cal. App. 4th Dist. Mar. 24, 2009) ("There is a strong possibility of inconsistent rulings between the arbitrator and this court based upon the intertwining issues."). Likewise, in *RFR Indus. v. Rex-Hide Indus.*, the Court enjoined arbitration because a party would be "prejudiced by having to pay to

litigate these issues twice—once in this Court, and again in arbitration. Further, RFR's attempt to litigate the same issues in federal court and before the arbitrator prejudices Century by subjecting Century to a risk of inconsistent adjudications." 2005 U.S. Dist. LEXIS 44812 at *5-6.

In *Culverhouse Inc. v. Saturn Transp. Sys.*, when some claims would be heard in arbitration and some in bankruptcy court, the court denied the motion to compel arbitration because "these conflicting claims arise out of a common nucleus of facts." 2004 Bankr. LEXIS 2225 at *12. ("If piecemeal litigation were ordered, the parties would have to try many of the same factual issues twice, in two different fora. This would impose unnecessary costs…and would create a risk of inconsistent adjudications." *Culverhouse*, 2004 Bankr. LEXIS 2225 at *10.) See also *Brown-McKee, Inc. v. Fiatallis Constr. Machinery, Inc.*, 587 F. Supp. 38, 39-40 (N.D. Tex. 1984) (party enjoined from "enforcing or utilizing" an arbitration clause because of "intertwining of the facts" between arbitrable and non-arbitable claims).[12]

**B.    Allowing Defendants to collect mandatory attorney fees from Plaintiffs if they prevail in arbitration is both illegal and substantively unconscionable.**

**i.    The attorney fee provision governing ¶12(b) violates CCP 1284.3.**

The arbitration provision Defendants presently seek to enforce is governed by ¶13, which provides that "In *any* action, proceeding *or arbitration* arising out of

---

[12] Likely realizing that ¶12's requirement that Plaintiffs split their case is unconscionable, Defendants pray the Court order the parties to arbitrate all clams, and only ask for bifurcation in the alternative. However, under the terms of ¶12(b), *there is no agreement to arbitrate all claims*, only those where general judicial reference is "unavailable." Defendants concede and Plaintiffs agree the binding general judicial reference is a creation of the California state courts that the Court lacks the authority to oversee, but it certainly has the authority to dismiss Plaintiffs' judicially referable state law claims, allowing Plaintiffs to refile the case in state court, where this procedure is permitted.

this Agreement (other than claims for construction defects), ***the prevailing party shall be entitled to reasonable attorney's fees and costs***." (emphasis added)[13]. Such provision is flagrantly illegal under California law, which prohibits arbitrators from ordering awards ***"under any agreement or rule requiring that a consumer who is a party to the arbitration pay the fees and costs incurred by an opposing party if the consumer does not prevail in the arbitration."*** Cal. Code Civ. Proc. § 1284.3 ("CCP 1284.3") (emphasis added).

**ii.    There is no "real estate transaction" exception to CCP 1284.3.**

In Defendants' reply in support of their prior motion ("Reply"), Defendants claim the "loser pays" condition in the Vue arbitration clause is not illegal because "real estate contracts are not typical consumer contracts." Reply at 14. This is incorrect. The Vue contract is a standardized contract prepared by a Defendant business and presented to hundreds of Plaintiff buyers—circumstances characteristic of consumer contracts.

CCP 1284.3 does not define "consumer."   Defendants suggest the Court substitute the definition of "consumer" from the Definitions section of the Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1761 ("CC 1761"), into CCP 1284.3. However, Defendants submit no authority that a California court has ever substituted the meaning of an undefined term from the CLRA. See *Taylor v. Carey*, 2008 U.S. Dist. LEXIS 71161 at *80 (E.D. Cal. Aug. 7, 2008) (where defendant "offers definitions of the term in unrelated statutes and case law," rejecting this offer and using the "plain meaning" of the term).

Even if the Court accepts Defendants' self-interested and faulty invitation to graft a definition from CC 1761 onto CCP 1284.3, their argument still fails. While

---

[13] Defendants claim "the 'loser pays' cost-shifting provision with which Plaintiff [sic] previously took issue…[is] totally absent from Paragraph 12(b)'s arbitration provision." Motion at 14. Defendants' interpretation is distinctly erroneous, as ¶13 applies to "***any*** action, proceeding or arbitration."

it is true that the CLRA does not apply to real estate transactions, the reason is not that "consumer" as defined in CC 1761 does not include buyers of residential real estate, but that an entirely separate part of the CLRA specifically excludes real estate transactions. Cal. Civ. Code § 1754 ("CC 1754"), also part of the CLRA, excludes "any transaction which provides for the construction, sale, or construction and sale of an entire residence[.]"

This leaves two mutually exclusive interpretations of "consumer" as defined by CC 1761. First, it could, as Defendants state, exclude real estate purchasers. Contrary to the rule that statutes are to be interpreted to give meaning to each part, this would render CC 1754 duplicative and superfluous. The second, and correct, interpretation, is that the word "consumer" does not have a "real estate transaction" exception, and that when the Legislature wishes to exclude real estate purchasers from consumer protection laws, it does so specifically, as it did in the CLRA.

### iii.   There is no "luxury" or "speculation" exception to CCP 1284.3.

Additionally, Defendants attempt to argue that Plaintiffs are not "typical" consumers by quoting the prices of their properties, alleging that "a majority of purchasers were represented by…brokers," and smearing certain other Vue buyers as engaging in "a speculator's scheme." Reply at 1, 14. However, in proposing this new "transaction size" element for invoking the protection of CCP 1284.3, Defendants cite neither case nor statute.

Indeed, in direct contravention of Defendants' claim that consumer laws do not extend to higher-priced, "luxury" items, the Ninth Circuit classified as "consumers" people who attempted to purchase original art by Salvador Dali. *United States v. Wiseman*, 1993 U.S. App. LEXIS 8787 at *25 (9th Cir. Apr. 15, 1993). Similarly, an Arizona court granted summary judgment and issued an injunction against a seller of fine art under 15 U.S.C. § 45(a), which requires a showing of "consumer injury." *FTC v. Solomon Trading Co.*, 1994 U.S. Dist. LEXIS 19696 at *9 (D. Ariz. June 27, 1994).

1   Also without citation, Defendants toss out another novel test:

2   Would any one of Plaintiffs have offered to refund to Developer any

3   appreciation in the price of their condominium units between purchase and

4   closing, had the real estate market continued its anticipated upward

5   trajectory? The answer to this rhetorical question demonstrates the fallacy of

6   Plaintiffs' assertion this is a "consumer" case.

7   This argument fails both as a matter of fact and as a matter of law. First, if the

8   values of the units had increased, the contract allows Defendants to default and/or

9   modify the price without paying any damages. Defendants would have reaped the

10  gains of these higher prices, while Plaintiffs would not have been able to sue for

11  damages. This is a common practice for developers in bull markets. See the articles

12  and complaints about developers refusing to deliver at pre-construction contract

13  prices in California, Washington, and Florida, attached as Exs. 3, 4, and 5 to

14  Weston Decl.

15  Further, the parties' hypothetical conduct after signing these contracts is wholly

16  irrelevant to whether Plaintiffs' claims are covered by CCP 1284.3. Indeed,

17  consumers have consistently made purchases in expectation of profit, including

18  valuable investments in art, coins, and other collectables. See *Wiseman*, 1993 U.S.

19  App. LEXIS 8787 at *25 (calling fine art buyers "consumers" and affirming

20  admission of testimony on why one buyer "was unable to realize the investment

21  value of her artwork"); *Solomon*, 1994 U.S. Dist. LEXIS 19696 at *1-2, *9 (calling

22  fine art buyers "consumers" and concluding that "Solomon's salespersons sold

23  these artworks as excellent, low-risk investments"); *FTC v. Security Rare Coin &*

24  *Bullion Corp.*, 931 F.2d 1312, 1313 (8th Cir. 1991) (calling rare coin buyers

25  "consumers" and finding defendants "fraudulently marketed rare coins to

26  consumers for investment purposes.").

27  **iv.   The "loser pays" cost-shifting provision is unconscionably one-sided.**

28

Finally, the cost-shifting provision is unconscionably one-sided, as Carlyle Group subsidiaries will predictably spend more money on attorneys and costs than ordinary individuals buying condominiums in "luxurious" downtown San Pedro could ever afford. This is obviously the case here, where at the last hearing Plaintiffs were represented by a single 28-year-old attorney, while Defendants brought three attorneys, including one who "previously served as Vice-Chair of the [Latham & Watkins] Global Litigation Department and Chair of the Los Angeles Litigation Department."

Not only is the attorney fee provision unconscionably lop-sided because of the foreseeable (to the Carlyle Group, if not to Plaintiffs) difference between the parties' likely costs, but the amounts are also grossly disproportionate in the real-life risk they place on the parties. Jorge Mendoza, who did not appear or attempt to prepare a defense to the arbitration action, was taxed by JAMS and Defendants for $20,000 in fees and costs under the same fee-shifting provision. Defendants presently seek still more blood from Mr. Mendoza and his mother in their petition to enforce the arbitration award, including additional fees, costs, and interest incurred in the post-arbitration petition. See Carlyle's Petition to Confirm Arbitration Award against Jorge Mendoza and Carina Matias, attached as Ex. 6 to Weston Decl.

While the prospect of having to pay the prevailing party's attorney fees may mean little to Raffi Cohen and the investment vehicles sponsored by the Carlyle Group, actually litigating an action in arbitration might easily result in costs and fees of over $50,000, more than the total amount of most deposits, given that Mr. Mendoza was ordered to pay $20,000 in costs in what was essentially a default victory for Defendants. In short, fee-shifting creates an enormous *in terrorem* deterrent to litigation for the economically weaker buyer parties to the contract.

In *Pokorny v. Quixtar, Inc.*, a court refused to enforce an arbitration clause in a franchise contract, recognizing the *in terrorem* effect of the clause's "loser pays"

provision on plaintiff individuals who asserted claims against defendant corporations. 2008 U.S. Dist. LEXIS 28439 (N.D. Cal. Mar. 31, 2008). In denying the defendants' motions to compel arbitration under a clause containing a "loser pays" provision, the court concluded that:

> Practically speaking, a "loser pays" provision makes arbitration a much greater financial risk than litigation. The [clause] thus requires [plaintiffs] to incur greater risk in the prosecution of statutorily-protected rights. This undoubtedly discourages [plaintiffs] from demanding arbitration, and therefore favors Quixtar substantially. … Courts have held such provisions unenforceable in California and other states. See e.g., *Veliz v. Cintas Corp.*, No. 03-1180, 2004 WL 2452851, at *22, 23, 37, (N.D. Cal. April 5, 2004) (invalidating "loser pays" provision as to plaintiffs from California, Colorado, and New Jersey). The Court finds that the "loser pays" provision…unfairly favors Quixtar and is therefore unconscionable.

*Pokorny*, 2008 U.S. Dist. LEXIS 28439 at *58-59.

## C. ¶12(a)'s attorney fee provision is unconscionable and violates public policy by waiving Plaintiffs' statutory right to attorney fees.

While the attorney fee provision that governs ¶12(b) is unconscionable for the reasons state above, the entirely separate provision that governs ¶12(a) also manages to be unconscionable and offend public policy by completely barring required statutory awards of attorney fees. Defendants suggest this provision doesn't mean what it says, that "each party must bear its own attorney fees," by pointing to another clause that allows "all remedies available in law or equity." These clauses indeed contradict each other because ***not having to bear one's attorney fees is a "remed[y] available in law*.**"

When a contract contains conflicting provisions, the more specific provision prevails. Here, it is not the general proviso that all remedies are available, but rather the specific provision that a certain remedy is not available. This more

specific provision waives the statutory right to attorney fees for prevailing Plaintiffs under state and federal antitrust law, where an award of attorney fees to prevailing plaintiffs is mandatory, and under ILSFDA, where it is discretionary but typically awarded.

The unilateral fee-shifting provisions of state and federal antitrust laws reflect a strong public policy favoring the filing of private antitrust actions. See, e.g., *Wilson v. Norbreck LLC*, 2007 U.S. Dist. LEXIS 26144, *8-9 (E.D. Cal. Apr. 9, 2007). ("The public policy implicit in the unilateral fee-shifting provision…is to encourage injured parties to broadly and effectively enforce the Cartwright Act in situations where they otherwise would not find it economical to sue.")

By eliminating the unilateral cost-shifting requirement, ¶ 12(a) is contrary to the public policy identified in *Wilson*. "Employing general contract law principles, courts will refuse to enforce arbitration provisions that are unconscionable or contrary to public policy." *Abramson v. Juniper Networks, Inc.*, 115 Cal. App. 4th 638, 651; 9 CR 3d 422 (2004) (reversing trial court's order to arbitrate contract that imposed unconscionable costs on plaintiff employees, as "statutory…rights may be transgressed as much by the imposition of undue costs as by outright denial").

## VII.  ¶12 is procedurally unconscionable.

### A.  The purchase contract is procedurally unconscionable.

Simply put, a contract of adhesion is one where "there was no opportunity to negotiate." *Armendariz v. Foundation Health Psychcare Services, Inc.*, 24 Cal. 4th 83, 115 (2000). Defendants admit there was no negotiation and blame Plaintiffs for failing to try.

Of course, Plaintiffs were in no position to do so. While residential real estate contracts are commonly conducted between parties of roughly equal bargaining power who negotiate terms like financing contingencies, prices, appliances, fixtures, and furniture, here Defendants admit that of the 239-some units sold, there

was not a single change in the contract. Without extensive discovery, it is impossible to learn whether any attempts at negotiation were actually rebuffed. However, the lack of changes is evidence either that other attempts at negotiation were rebuffed, or that Defendants' sales practices, customized form contract, and lack of reasonably similar alternatives created the (likely correct) impression that no negotiation was possible.

Defendants ask Plaintiffs to produce evidence for lack of reasonably similar alternatives. While such evidence is not necessary to establish procedural unconscionability, especially in the real estate context[14], Plaintiffs note Defendants' marketing materials state that "There has not been new housing built in the downtown [San Pedro] area in more than 50 or 60 years." See Vue Press Release, attached as Ex. 7 to Weston Decl.

Further, to negotiate the judicial reference clause, Plaintiffs would have had to know what the term meant. However, even Plaintiffs' counsel had never heard the term before commencing this case. This circumstance is hardly surprising, as searches on Lexis and Google have indicated that references to "arbitration" are respectively **90 and 4,540 times** more common than references to "judicial reference." See Weston Decl., ¶6. In fact, **Defendants** also did not have a clear idea of what judicial reference entails, asking the Court to compel judicial reference in their reply brief in support of their previous arbitration motion, then researching the issue and finding that it was unavailable for many of the claims. Even now, they are still not sure what ¶12 requires, asking for either arbitration or a tortuous combination of arbitration and judicial reference. How non-attorney Plaintiffs might have negotiated these provisions with non-attorney salespeople when Defendants' counsel is still uncertain what these convoluted and poorly-drafted

---

[14] See *Pardee Construction Co. v. Superior Court*, 100 Cal. App. 4th 1081, 1087; 123 CR 2d 288, 291 (2002) (A developer defendant's "argument that plaintiffs can go elsewhere if they don't like it flies in the face of the uniqueness of a home.").

1  ADR provisions require after extensive research and inconsistent requests in two

2  motions is a question Defendants might answer in their reply brief.

3  **B.   The arbitration provision is procedurally unconscionable for failing to**

4  **furnish the rules that govern the arbitration.**

5      Unlike the arbitration provision in ¶¶10-11, the ¶12(b) arbitration provision

6  does not describe the rules that govern the arbitration. Instead, it identifies a

7  specific set of AAA rules ***only*** for construction defect cases, which provides no

8  guidance on the set of rules that governs the arbitration of Plaintiffs' other claims.

9  AAA's rules under ¶12 are distinct from JAMS's rules under ¶11, are not attached

10 to the purchase contract, and are described in numerous separate documents.[15] By

11 failing to furnish the referenced rules to its consumer counterparties (or even

12 identify the applicable rules with sufficient specificity to allow Plaintiffs to review

13 the rules before signing the contract), Carlyle's arbitration provision satisfies the

14 standards for oppression and surprise, which renders the provision procedurally

15 unconscionable.

16     In *Harper v. Ultimo*, a California court criticized an arbitration provision in a

17 consumer contract between a contractor and a homeowner as both "surpris[ing]"

18 and "oppressi[ve]" for "merely referencing the Better Business Bureau arbitration

19 rules, and not attaching those rules to the contract for the customer to review." 113

20 Cal. App. 4th 1402, 1406; 7 CR 3d 418, 422 (2003). Like Carlyle's arbitration

21 provision, the *Harper* arbitration provision was held procedurally unconscionable

22 because "[t]he customer is forced to go to another source to find out the full import

23

---

24 [15] For example, the AAA has separate rules for, e.g., consumer cases, commercial
25 cases, simple cases, complex cases, class arbitration cases, and real estate cases,
   many of which reference other rules and documents. Answering the question of
26 which of AAA's multiple rules is applicable to Plaintiffs' claims will require
   significant time, effort, and expense. This concern is not theoretical. In the twelve
27 arbitrations initiated by Defendants before JAMS, the parties disputed whether
28 JAMS's consumer or commercial rules applied.

of what he or she is about to sign and must go to that effort *prior* to signing." *Id.* (affirming order denying motion to compel arbitration).

Similarly, in *Hooters of Am. v. Phillips*, the court declined to compel the plaintiff to arbitrate her sexual harassment claim, as the plaintiff should have been "informed of the substantive statutory rights which she was waiving" under the rules of the arbitration *before* she signed the agreement. As here, "[t]hat information was in the [organization's] Rules," which were never provided. 39 F. Supp. 2d 582, 611-612 (D.S.C. 1998).

## C.   Where an arbitration provision merely references the rules that govern the arbitration proceedings, hidden fees are particularly disfavored.

AAA's consumer arbitration rules provide that:

If the consumer's claim or counterclaim exceeds $75,000, or if the consumer's claim or counterclaim is non-monetary, then the consumer must pay an Administrative Fee in accordance with the Commercial Fee Schedule. … The consumer must also deposit one-half of the arbitrator's compensation. … The arbitrator's compensation rate is set forth on the panel biography provided to the parties before the arbitrator is appointed.[16]

Assuming *arguendo* and contrary to the position Carlyle has already taken that the present action is a consumer case (and can thus qualify for AAA's lowest—but still prohibitive—fee schedule), Plaintiffs' claims both (1) exceed $75,000 and (2) seek nonmonetary relief, and thus are subject to the Commercial Fee Schedule. Therefore, Plaintiffs seeking approximately $11 million as a class must pay a $12,500 "initial filing fee" and a $6,000 "case service fee" merely to initiate the dispute, as well as another $3,250 "preliminary filing fee" to arbitrate their claims as a class.[17] Additionally, Plaintiffs must "deposit one-half of the arbitrator's

---

[16] http://www.adr.org/sp.asp?id=22039.

[17] http://www.adr.org/sp.asp?id=21936.

compensation"—a requirement that far exceeds the financial capacity of most proposed class members.

Where a corporation fails to furnish a copy of the rules that govern the arbitration to its counterparties, such hidden fees are particularly disfavored. In *Kinkel v. Cingular Wireless, LLC*, the court found an arbitration provision procedurally unconscionable because:

> [T]he agreement did not put [the plaintiff] on notice that she would bear any of the costs associated with arbitration. The agreement merely stated that "fee information" was available from Cingular or the AAA "upon request." This statement, incorporating by reference information that was not provided to plaintiff at the time she signed the agreement, was in fine print near the bottom of an 8 by 14 inch page that was filled, from margin to margin, with text. This statement was not emphasized in any way."

223 Ill. 2d 1, 26-27 (Ill. 2006). Here, the AAA rules were similarly "not provided to [P]laintiff[s]," and the indefinite reference to the rules was once again "near the bottom of an 8 by 14 inch page that was filled, from margin to margin, with text" and "not emphasized in any way."

**D.    The arbitration and judicial reference provisions of ¶12 are complicated, confusing, and inconspicuous to the point of procedural unconscionability.**

**i.    The arbitration provision is not in bold type**

CCP 1298 requires that arbitration provisions in real estate purchase contracts "be set out in at least 8-point bold type or in contrasting red." While the arbitration provisions in ¶¶10 and 11, which Defendants relied upon in their first motion, complied with CCP 1298, the arbitration provision in ¶12(b), upon which Defendants now move, does not.

**ii.    The arbitration provision is substantially more confusing and less conspicuous than the model and guidelines provided by the AAA.**

1   The AAA offers guidelines for creating arbitration clauses that place consumers
2   on "clear and adequate notice of the arbitration provision and [provide] basic
3   information regarding the process at the time of assent." See AAA's suggested
4   "Notice of Arbitration Agreement," attached as Ex. 1 to Weston Decl.

5   ¶12 provides for binding arbitration before AAA, but fails to comply with the
6   AAA's standards on "clear and adequate notice" and "basic information regarding
7   the [arbitration] process." For example, the AAA states that "[c]onsumers should
8   be given…information regarding the arbitration process, including basic
9   distinctions between arbitration and court proceedings." However ¶12(b) does not
10  describe that Plaintiffs thereby "give up [their] right to go to court," that the
11  dispute is not decided by a judge or a jury, that the rules of arbitration are "simpler
12  and more limited" than the rules of court, and that the decision of the arbitrator is
13  subject to "very limited review" by a court. In fact, it *makes no mention* courts,
14  judges, or juries at all.

15  The AAA also states that "[c]onsumers should be given…advice as to where
16  they may obtain more complete information regarding arbitration procedures."
17  However, the provision does not provide any indication of where Plaintiffs may
18  find more information about arbitration, let alone a website or toll-free telephone
19  number, as the AAA suggests.

20  **iii.    Contrary to common practice, the cover of the contract fails to warn the buyers that the contract contains a waiver of their right to a jury trial.**
21

22  In order to provide purchasers with clear notice of an arbitration provision, most
23  sellers of pre-construction condominiums have adopted the practice of including a
24  warning in capital letters in a bold box *on the front cover or the first page of the*
25  *purchase contract.*[18]

26  _____
    [18] D.R. Horton, the nation's largest residential developer, provides on its cover
27  page "THIS CONTRACT CONTAINS A BINDING ARBITRATION
    PROVISION. YOU SHOULD COUNSULT LEGAL COUNSEL WITH ANY
28  QUESTIONS ABOUT ANY OF THE PROVISIONS OF THIS CONTRACT."

**VIII.      The contract is revocable and Plaintiffs seek to revoke it.**

Under California law, "when an illegal contract that is correctly subject to revocation contains an arbitration agreement, the arbitration agreement will not be enforced." *Duffens v. Valenti*, 161 Cal. App. 4th 434, 449; 74 CR 3d 311, 321 (2008); *rev. and req. for depublication denied*, 2008 Cal. LEXIS 8606 (Jul. 9, 2008).

Here Plaintiffs allege the contract is subject to revocation for violations of the Interstate Land Sales Full Disclosure Act ("ILSFDA").[19]

ILSFDA at 15 USCS § 1703(c) provides:

In the case of any contract or agreement for the sale or lease of a lot for which a property report is required by this title and the property report has not been given to the purchaser or lessee in advance of his or her signing such contract or agreement, such contract or agreement may be revoked at the option of the purchaser.

Thus, (1) ILSFDA requires certain developers to provide Property Reports; (2) Defendants failed to furnish such Reports; and (3) the statute states that non-compliant contracts are revocable.

Cal. Code Civ. Proc. § 1281.2(b) provides that:

On petition of a party to an arbitration agreement alleging the existence of a written agreement to arbitrate a controversy and that a party thereto refuses

---

Two others for San Diego condo towers have on the first page "THIS AGREEMENT CONTAINS A BINDING ARBITRATION PROVISION IN ACCORDANCE WITH THE FEDERAL ARBITRATION ACT. YOU SHOULD CONSULT LEGAL COUNSEL WITH ANY QUESTIONS." See Exs. 8, 9, and 10 to Weston Decl.

[19] See previously submitted Buyers' Decls., ¶4, Docket No. 64. These federal ILSFDA reports are quite conspicuous, as they are required to contain on their front cover "a warning, centered, in 1/2 inch capital letters in red type…which reads as follows: READ THIS PROPERTY REPORT BEFORE SIGNING ANYTHING." 24 CFR 1710.105 (2003).

to arbitrate such controversy, the court shall order the petitioner and the respondent to arbitrate the controversy if it determines that an agreement to arbitrate the controversy exists, ***unless it determines that…[g]rounds exist for the revocation of the agreement***.

Thus, Defendants' violations of ILSDFA constitute grounds for the revocation of the purchase contract, including the arbitration clause. In *Duffens*, quoted above, a California court affirmed the trial court's denial of a dating service's motion to compel arbitration because the service's contract lacked obligatory language under state law. Like Plaintiffs' purchase contract, the court concluded that "these 'consulting agreements' are part of a small class of contracts regulated by specific statutes that expressly render nonconforming contracts void and unenforceable." *Duffens*, 161 Cal. App. 4th at 441.

[I]f a statute prescribes the only method in which a valid contract can be made, a contract that fails to follow that method is void. Omitting required provisions, as here, does not follow the requirements of statute.

*Duffens*, 161 Cal. App. 4th at 455. Furthermore, the *Duffens* court held "the agreements do not belong within the general category allowing severable arbitration clauses, because of the importance of the omitted provisions." 161 Cal. App. 4th at 456. The Court continued:

We cannot find the arbitration provisions in this case to be severable from these contracts under these authorities. … The defects in these agreements are central to the policy of the statutes, and the express language of the statutes regarding unenforceability applies to the arbitration clauses as well.

Like the dating service statutes, ILSFDA "represent[s] the Legislature's intent to regulate" a certain class of contracts in a specific manner. See *Sun Kyung Ahn v. Merrifield Town Ctr. Ltd.*, 2008 U.S. Dist. LEXIS 93242 (E.D. Va. Oct. 27,

2008).[20] As in *Duffens*, the defects in Plaintiffs' purchase agreements "are central to the policy of the statutes,[21] and the express language of the statutes regarding unenforceability applies to the arbitration clauses as well." Thus, the Court should follow *Duffens*, and deny arbitration on these grounds, or if the Court is unable to deny the Motion on other grounds and is not satisfied that Plaintiffs have established the revocability of the contract under ISLSFDA, Plaintiffs request the Court allow the parties to brief the issue separately in a summary judgment motion. See *Duffens*, 161 Cal. App. 4th at 443 (In a motion to compel arbitration, the court may need to "utiliz[e] summary motion procedures," even if the issues on such motion "overlap those raised by the plaintiff's claims for relief.").

## IX.  Conclusion

For the foregoing reasons, the Motion should be denied.

DATED: April 1, 2009                    Respectfully submitted,

                                        s/Gregory S. Weston

                                        ***Attorney for Plaintiffs***

---

[20] "Through ILSFDA's disclosure requirements, Congress intended to ensure that, prior to purchasing certain types of real estate, a buyer is apprised of the information needed to make an informed decision. … In the event a seller fails to provide the purchaser with the required property report, § 1703(c) allows a purchaser to revoke the non-exempt contract[.]" *Sun Kyung*, 2008 LEXIS 93242 at *14, *19 (granting partial summary judgment for plaintiff purchasers on ILSFDA claims).

[21] ILSFDA serves a "'punitive' or 'rehabilitative' governmental aim, rather than a purely compensatory purpose." *Richmond v. N.H. Supreme Court Comm. on Prof'l Conduct*, 542 F.3d 913, 920 (1st Cir. 2008). In fact, ILSFDA's punitive purpose is so central to public policy that ILSDFA disgorgement debts are non-dischargeable in bankruptcy proceedings. *Id.*